Filed 2/22/16  P. v. Rafail CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JAY RAFAIL,<br><br>　　　Defendant and Appellant. | D067116<br><br><br><br>(Super. Ct. No. SCN325828) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.

Zachary McCready & Associates, Zachary James McCready; Law Office of Kristine L. Adams and Kristine L. Adams for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene Sevidal and Allison V. Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

In late September 2014 a San Diego County jury convicted Jay Rafail of a total of 25 sexual offenses committed between 1999 and 2008 against four boys (Phillip L., John

Doe, Jeremy S. & Justin S.), as follows:  *15 counts* of committing a lewd act upon a child

under 14 years of age (Pen. Code,[1] § 288, subd. (a) (hereafter § 288(a)):  counts 1–7

[victim: Phillip L.], 13–16 & 18–21 [victim: John Doe][2]); plus *9 counts* of committing a

lewd act upon a child 14 or 15 years of age (§ 288, subd. (c)(1) (hereafter § 288(c)(1)):

counts 8–11 [victim: Phillip L.], 22–24 [victim: Jeremy S.] & 25-26 [victim: Justin S.]);

and *one count* of sodomy of an intoxicated person (§ 286, subd. (i) (hereafter § 286(i)):

count 12 [victim: Phillip L.]).

With respect to counts 1–7, 13–16, and 18–21, the jury found to be true an

allegation that Rafail committed the offenses against more than one victim (§ 667.61).

As to those same 15 counts, the court found to be true an allegation that Rafail qualified

as a habitual sex offender (§ 667.71, subd. (a)).  The court also found to be true an

allegation that Rafail had suffered three prior convictions of committing a lewd act upon

a child (§ 288(a)), which qualified as strike priors within the meaning of the Three Strikes

law (§§ 667, subdivisions (b)–(i), 1170.12, 668).

On December 1, 2014, the court sentenced Rafail to a total state prison term of

1,375 years to life plus five years.

Rafail raises several claims on appeal.  First, he contends the court committed

instructional error and the prosecutor committed misconduct during her closing

arguments by telling the jury to not consider the lesser included offenses for each of the

---

1    All further statutory references are to the Penal Code unless otherwise specified.

2    At the end of the prosecution's case, the court dismissed count 17, on the People's motion, for lack of jurisdiction.

2

25 charged sexual offenses, thereby denying both his right to present his defense and his right to a fair trial.

Second, he contends (1) the evidence is insufficient to support the jury's finding that the prosecution met its burden of proving the requirements under section 803, subdivision (f), and CALCRIM No. 3250 for extending the statute of limitations period for count 23; and (2) CALCRIM No. 3250 as given by the court confused the jury.

Third, he contends the prosecutor committed misconduct during her closing argument, and thereby violated his federal constitutional rights to cross-examination and a fair trial, by misrepresenting facts and misstating the law.

Fourth, he contends "the prosecution's misuse of the prior uncharged acts, and current uncharged acts, under Penal Code [*sic*][3] sections 1101 and 1108 exploited existing confusion in the complex of facts and law [*sic*] which sabotaged most, if not all, of the safeguards to a constitutionally fair trial."

Last, he contends the court "committed reversible error when it failed to adequately address the jury's request for assistance in jury note [No.] 1."

For reasons we shall explain, we affirm the judgment.

---

[3]     We assume Rafail meant to refer to the Evidence Code.

FACTUAL BACKGROUND

A. *The People's Case*

1. *Prior sex offenses against Patrick V.*

Patrick V. testified that his parents employed Rafail as a tutor from September 1989 to December 1989 when he (Patrick) was nine years old. During that time period, Rafail picked Patrick up from school but, instead of helping Patrick with his homework, he would drive around and then park near Patrick's house. Rafail would then masturbate Patrick, Patrick would masturbate him, and he would perform oral sex on Patrick. Patrick's parents fired Rafail because Patrick was not completing his homework. After he was fired, Rafail occasionally picked up Patrick from the babysitter's house. Rafail sometimes took Patrick to Rafail's house and molested him there by engaging in oral sex and rubbing his penis on Patrick's buttocks.

In 1990 Patrick reported Rafail's conduct to his babysitter's daughter, his mother, and the police. In the present trial, the parties stipulated that Rafail was convicted as a result of his conduct toward Patrick.

2. *John Doe*[4]

John Doe (Doe) testified that when he was nine or 10 years old, he developed a friendship with Rafail, who was an adult, through martial arts. Rafail would invite Doe to go to the movies and events like Monster Truck racing. When they became better acquainted, Rafail began telling Doe about his sexual experiences, and Doe began to respect him as a "sex guru." Rafail started buying him presents such as Game Boys, Pokemon cards, and bicycles.

Rafail began living with Doe's family in Escondido when Doe was 10 or 11. Rafail began sleeping on the floor in Doe's room, but eventually he slept with Doe in Doe's bed. Rafail's first sexual contact with Doe occurred at night when Doe was 10 years old. Doe testified that when he got out of the shower, Rafail was lying on the bed, and he (Doe) "felt some sort of sexual tension that [Rafail] wanted." Remembering stories Rafail had told him about experimenting with his friends when he was younger, Doe offered to put his mouth on Rafail's penis for 10 seconds in exchange for $40. Rafail accepted the offer and Doe performed the act.

After this first sexual contact, sexual acts between Rafail and Doe began to occur with more frequency, three to five times a week. Rafail regularly masturbated and orally

---

4     The court granted this victim's request to keep his name out of the public record and allowed him to testify as John Doe. The prosecution charged that Rafail committed the following nine offenses against Doe:  (1) count 13 (receiving oral sex), (2) count 14 (giving oral sex at Rafail's parents' house), (3) count 15 (first time giving oral sex at Doe's home), (4) count 16 (last time giving oral sex at Doe's home), (5) count 17 (giving oral sex at karate tournament; see fn. 2, *ante*), (6) count 18 (first time masturbating by "dry-humping"), (7) count 19 (last time masturbating by dry-humping), (8) count 20 (videotaping receiving oral sex), and (9) count 21 (videotaping masturbation of Doe).

copulated Doe to the point of ejaculation. About once a week, Rafail would ask Doe to place his mouth on his penis or Rafail would dry-hump Doe by rubbing his genitals on Doe's buttocks. On other occasions, when Doe was between the ages of 10 and 13, Rafail performed and received the same sexual acts at Rafail's parents' house.

Doe testified he felt the sexual acts were wrong, but he enjoyed the toys and fun experiences his parents could not afford to give him. Sometimes Doe felt uncomfortable engaging in sexual acts with Rafail. Whenever Doe refused Rafail's requests, Rafail would become angry and make Doe feel guilty by reminding Doe of the gifts he had given to him. Doe would then give in to Rafail's sexual demands. Doe was afraid to say no, and he did not want to lose Rafail's friendship.

When Doe was 11, he, his parents, and Rafail went to a karate tournament. Rafail persuaded him to go with him into Doe's parents' van and then performed oral sex on Doe.

On another occasion at Rafail's parents' house, Rafail and Doe went "skinny-dipping" in the pool, and Rafail later gave Doe oral sex inside the house. Rafail tried to perform anal sex on Doe on one occasion, and Doe performed anal sex on Rafail several times.

A video played for the jury showed Doe performing oral sex on Rafail, Rafail masturbating Doe, and Rafail masturbating himself while dry-humping Doe. Doe was 10 or 11 years old at the time and did not know he was being filmed.

Doe also testified that Rafail lived with Doe's family for about a year and a half. Doe's sister saw Rafail touching Doe's genitals at one point and reported the incident.

6

Doe's parents confronted Doe and asked him whether Rafail had had any inappropriate sexual contact with him. Doe lied to them because he enjoyed the presents Rafail gave him and he was afraid that people would know he had been molested. Doe testified that his parent's "kicked [Rafail] out" of their house, and Rafail moved to San Marcos. However, Rafail's sexual contact with Doe continued. When Doe was 12 years old, Rafail formed two paintball teams that included Doe and other boys, and he began encouraging the boys to drink alcohol. Eventually, there was a total of 10 boys under the age of 14 in the two teams. The group regularly traveled to tournaments and stayed in hotels, and Rafail acted as the chaperone. When they were in the hotel rooms, Rafail encouraged them to perform sexual acts on one another. Specifically, Doe testified that Rafail encouraged the boys to masturbate each other, and Rafail sometimes filmed the acts.

The sexual acts continued until Doe was 15 or 16 years old. Doe testified he planned to "take it to the grave" by never speaking about the sexual molestation, and he repeatedly lied to his parents when they questioned him. Although Doe was 25 years old when he testified against Rafail in this case, he did not want his name made public.

7

3. *Phillip L.*[5]

Phillip L. testified that he met Doe and Rafail through martial arts when he was between the ages of 10 and 12. He first started "hanging out" with Doe and Rafail when Rafail invited him to Doe's birthday party. During the party, Rafail dared Phillip to "go streaking," and Phillip did it. After the party, Phillip began to interact with Rafail and Doe on a regular basis. Phillip initially thought Doe and Rafail were brothers because they were so close and shared a room. Several times before Rafail ever touched him, Phillip woke up and saw Rafail giving Doe oral sex.

Phillip testified that his first sexual contact with Rafail occurred when Phillip spent the night at Doe's house and awoke to Rafail's fondling Phillip's penis under his underwear. Phillip told no one about the incident because he was "scared of what people would think."

On other subsequent occasions, Rafail encouraged Phillip and Doe to masturbate themselves in front of him. Phillip testified that Rafail made this conduct seem normal, and Phillip became loyal to Rafail because Rafail "kind of took the place of [Phillip's] father."

After Rafail moved out of Doe's house, Phillip began to spend the night at Rafail's apartment on the weekends prior to paintball tournaments. Although Phillip's mother

---

[5]     Rafail was charged with committing the following 12 offenses against Phillip: counts 1 (fondling at Rafail's house), 2 (first time instructing Phillip to masturbate himself), 3 (last time instructing Phillip to masturbate himself), 4 (first time showering), 5 (last time showering), 6 (first time naked massage), 7 (last time naked massage), 8 (first time giving oral sex), 9 (last time giving oral sex), 10 (giving oral sex after trip), 11 (shaving testicles), and 12 (sodomy of intoxicated person).

asked him whether Rafail ever did anything inappropriate to him, he told her nothing was going on, in part because he was afraid.

Phillip testified that by the time he was 12 or 13 years old, he was living with Rafail Wednesdays through Sundays. During that time, Rafail and Phillip always slept together naked, regularly showered together, regularly drank alcohol, and Phillip masturbated in front of Rafail daily. When they showered together, Rafail washed Phillip's entire body with his bare hands. Rafail regularly massaged Phillip while Phillip was naked, and the massages included his buttocks, penis, and testicles. When he was 14, at Rafail's request, Phillip and another boy masturbated each other while Rafail recorded them.

Phillip also testified that when he was 13 or 14 years old, Rafail began performing oral sex on him while he was asleep in Rafail's apartment in San Marcos. A few nights a week, prior to oral sex, Rafail gave Phillip both alcohol and pills that relaxed him. On many of these occasions, Phillip awoke the next morning with lubricant on his penis but no memory of what had happened. On one occasion, Phillip woke up on his back with Rafail sitting on top of him and with Phillip's penis in Rafail's anus. Phillip testified that before he woke up, while he was on his stomach and "kind of coming in and out," he felt "something trying to go inside my butt but that didn't happen." He felt "ejaculation on [his] back." He recalled drinking a lot of alcohol the night before, and he felt like he was still under the influence of something at the time.

Phillip testified he participated in Rafail's paintball team and traveled to paintball tournaments with Rafail and the other boys. Inside the hotel room the boys typically

9

were naked, they would masturbate each other in different positions, and on one occasion Rafail videotaped them. The masturbation "contests" and video-recording were Rafail's ideas.

Phillip also testified that on one occasion, when he was 15 years old, Rafail shaved Phillip's testicles in Rafail's apartment, and in exchange Rafail gave Phillip a paintball gun. Rafail used his hands to apply a chemical hair remover to Phillip's testicles, then washed it off and used a razor to shave off the remaining hair on Phillip's testicles.

Phillip twice discovered recording devices in Rafail's apartment. The first time, he found a camcorder hidden inside a sock in a pile of laundry near the living room couch. The camera was hooked up to a wire that went into a wall and then to a VCR in another room. One of the video tapes showed Phillip masturbating. Phillip confronted Rafail about it, and Rafail agreed to destroy the tape. Later, at a different apartment, Phillip found a similar setup and a similar video, and Phillip destroyed it.

Phillip testified that Rafail's sexual acts with him continued until Phillip was 18 years old. While Phillip was in high school, Rafail discouraged him from having relationships with girls. Rafail agreed to purchase a car for Phillip if Phillip slept naked with him for a year. After that year, Rafail bought him a new Volkswagen GTI.

One night, as Phillip was getting ready for bed, Rafail asked him whether he wanted another shot of liquor. Thinking Rafail was taking too long in pouring the drink, Phillip checked on him and found him trying to hide something that turned out to be a powdery substance he had been getting ready to put into Phillip's drink. Phillip became so angry that he grabbed all of his belongings and left Rafail's apartment. Phillip testified

10

he went to a behavioral health facility the next day and told a psychiatrist about what Rafail had done to him. In September 2012, Phillip reported Rafail's actions to law enforcement. Phillip did not see Rafail again until Phillip testified in this case.

*4. Jeremy S.*[6]

Jeremy S. testified that when he was 13 years old, he met Rafail at a karate studio in Escondido where Rafail worked as an instructor. Jeremy socialized with Rafail and Doe during tournaments and joined them at amusement parks and the beach. One time, while spending the night at Doe's parents' house, Jeremy became intoxicated, fell asleep on the floor, and awoke as Rafail was giving him oral sex. Doe witnessed the act.

Jeremy testified that on another occasion at Rafail's parents house, when Jeremy was 15 years old, Rafail gave him a few beers and offered him $750 if he would shave his pubic hair. Rafail helped Jeremy shave himself and videotaped the act. After he helped Jeremy shave his scrotum, Rafail helped him wash his testicles and penis. They had more drinks, and Rafail asked him to wear a white cotton thong before going to bed. After Jeremy fell asleep, he awoke as Rafail was giving him oral sex. Doe corroborated Jeremy's testimony by testifying that Rafail asked Jeremy to "shave his pubic hair" in exchange for "hundreds of dollars."

Jeremy also testified that when was 19 years old, he briefly lived in Rafail's living room. Before he moved in, he told Rafail that he remembered what he had done and that

---

6    Rafail was charged with committing three offenses against Jeremy S.: counts 22 (giving oral sex at Doe's house), 23 (shaving testicles), and 24 (giving oral sex at Rafail's parents' house).

it was wrong. Rafail replied that he should not tell anyone and that, if asked, he should say he was 18 years old at the time.

5. *Justin S.*[7]

Justin S. testified he was 14 or 15 years old when he became involved with Rafail and the other boys through participation on the paintball team. He sometimes socialized with the group at Rafail's apartment. Rafail encouraged a lot of nudity and showering together, and Justin noticed Rafail had a lot of pornography and alcohol. Rafail shared beds with the boys and encouraged them to drink alcohol. Justin also testified that while they were in Florida for a tournament, Rafail performed oral sex on him after they drank alcohol and Justin began to fall asleep.

Justin also testified that when he was 15 or 16 years old, Rafail performed oral sex on him three to five times at Rafail's apartment after Justin had been drinking. Justin stopped playing paintball with the group when he was 16 or 17 years old after the group discovered Rafail was a registered sex offender.

6. *Other Evidence*

Jeremy K., another member of the group, corroborated the victims' testimony. He testified that when he was about 13 years old, he met Rafail at the karate studio and became involved in martial arts competitions and the paintball team. He noticed that Rafail gave him and the other boys anything they asked for, including alcohol. Whenever he spent the night at Rafail's house, he noticed that Rafail shared a bed with Phillip or

---

7    Rafail was charged with committing two offenses against Justin S.: counts 25 (first time giving oral sex) and 26 (last time giving oral sex).

Doe. Rafail had a lot of pornographic magazines and encouraged the boys to look at them. Jeremy also noticed that Rafail gave a lot of gifts to Doe and Phillip. When the group traveled to tournaments, Rafail supplied alcohol and pornography, videotaped them, and encouraged nakedness, wrestling, and masturbation contests. Rafail once offered to masturbate Jeremy in Rafail's apartment, but Jeremy refused the offer.

A search of Rafail's home resulted in the discovery of numerous videos. The video played for the jury was the only one that depicted sexual acts.

B. *The Defense*

Justin's father testified for the defense. He stated that he became suspicious about Rafail and the karate team when Justin was 16 years old. Justin told him nothing had happened, and he believed Justin at the time.

Doe's mother, Patricia G., testified about her family's relationship with Rafail. Rafail lived with them and shared a room with Doe. She explained that Rafail spent increasing amounts of time with her son and bought him many things, including a bicycle, she could not afford to buy for him. Doe's father was infuriated by the gifts. Patricia G. testified that Doe convinced her "[t]o a certain degree" that Rafail had not inappropriately touched him, but she admitted at trial that, in retrospect, she had been "an idiot."

The defense also called Polly Grissom. She met Rafail at the karate studio. When she learned in 2005 about Rafail's prior conviction and asked him about it, she was satisfied with his explanation and eventually began living with him in 2008. She testified she was not aware of any inappropriate contact between Rafail and any children. At

13

some point, she observed behavioral changes in Phillip and suspected he was using drugs. Grissom also testified that Rafail gave Phillip a debit card for Phillip to use to buy food while Rafail was in the hospital, and Phillip took all of the money from Rafail's account. She trusted other children, including her own son and daughter, to be alone with Rafail because she never saw any behavior that would make her be concerned.

DISCUSSION

I. *CLAIMS OF INSTRUCTIONAL ERROR AND PROSECUTORIAL MISCONDUCT (ALL 25 COUNTS)*

Rafail challenges his convictions of all 25 charged sexual offenses by contending the court committed instructional error and the prosecutor committed misconduct during her closing arguments by telling the jury to not consider the lesser included offenses for each of those 25 greater offenses, thereby denying him the right to present his defense and his right to a fair trial. We reject this contention because Rafail has distorted the court's instructions and the prosecutor's statements by quoting them out of context.

A. *Background*

As to the sodomy-of-an-intoxicated-person offense charged in count 12, the court instructed the jury under CALCRIM No. 960 on the lesser included offense of simple battery (§ 242). As to count 12 and the 24 lewd act charges (counts 1-11, 13-16 & 18-26), the court instructed the jury under CALCRIM No. 915 on the lesser included offense of simple assault (§ 240).

The court orally instructed the jury regarding its consideration of the lesser included offenses. The court began by explaining that Rafail was charged with 25 counts

14

and the jury had one verdict form for each of those greater offenses. The court also explained there was one lesser included offense for 24 of those counts and two lesser included offenses for the remaining count (count 12), and, thus, there was a total of 51 verdict forms. Soon thereafter, the court told the jury:

> "If you find the Defendant guilty of the greater charged crime . . . , then you leave the [lesser included offense] form blank. [¶] But *if you find the Defendant not guilty*[], *then you may consider the lesser offense*." (Italics added.)

The court also told the jury, "I cannot accept a verdict on a lesser offense unless the jury unanimously comes back not guilty on the greater charged offense. If you can't reach a verdict on the charged offense, then you leave both forms blank and return them to me and tell me you can't reach a verdict." The court added:

> "*You can consider the charges in whatever order you want*. I'm just telling you I can't accept a verdict unless it's not guilty on the greater charge." (Italics added.)

In its written instructions to the jury, the court gave CALCRIM No. 3517 ("Deliberations and Completion of Verdict Forms"), which stated in part:

> "If all of you find that the defendant is not guilty of a greater charged crime, you may find him guilty of a lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime. [¶] . . . [¶] *It is up to you to decide the order in which you consider each crime and the relevant evidence*, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime." (Italics added.)

During her closing arguments, the prosecutor explained the verdict forms to the jury and how the jury should complete them:

15

"You're going to fill in your answers. *If it's guilty*, true and true, for example, you sign and date. [¶] *And what that means is you don't get to the lesser included offenses* that were talked about. So the lesser included offenses of assault or battery as it relates to sodomy, you don't get to those. You leave those blank. And you move on to the next one. [¶] You fill out the next verdict form. You see the lesser included offense. You leave that blank. *It's only if you can't agree or you find him not guilty that you then move on to the lesser charge*." (Italics added.)

B. *Analysis*

1. *Instructional error claims*

a. *Consideration of lesser included offenses*

Rafail claims the court erroneously "instructed the jury not to look at the lesser included [offense] until after making a decision on the charged crime." In making this claim, he relies on the court's following oral statement to the jury: "If you find the Defendant guilty of the greater charged crime . . . , then you leave the [lesser included offense] form blank. [¶] But *if you find the Defendant not guilty . . . , then you may consider the lesser offense*." (Italics added.) We reject Rafail's claim.

"When reviewing an instructional ambiguity claim, we ask whether the jury was reasonably likely to have construed the instruction in a manner that violated the defendant's rights." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1110 (*Bacon*).)

The California Supreme Court has explained that "[u]nder the acquittal-first rule, a trial court may direct the order in which jury verdicts are *returned* by requiring an express acquittal on the charged crime before a verdict may be returned on a lesser included offense." (*Bacon*, *supra*, 50 Cal.4th at p. 1110, italics added.) However, the jury can deliberate on the charges in any order, and the trial court may not prohibit the

16

jury from *considering or discussing* a lesser included offense before returning a verdict on the corresponding charged offense. (*People v. Kurtzman* (1988) 46 Cal.3d 322, 325, 335-336.)

Here, the record establishes that the court correctly instructed the jury on the law, and it shows that Rafail has quoted the court's foregoing statement out of context. Specifically, the record shows the court made the statement on which Rafail relies. However, Rafail disregards the court's subsequent clarifying statement, "*You can consider the charges in whatever order you want*. I'm just telling you I can't accept a verdict unless it's not guilty on the greater charge." (Italics added.) Thus, the court did inform the jury it could consider a lesser included offense *before* it made a decision on the corresponding charged offense. The court's written instructions further emphasized that the jury could consider the lesser included offenses during its deliberations. Specifically, the court instructed the jury under CALCRIM No. 3517 that "[*i*]*t is up to you to decide the order in which you consider each crime and the relevant evidence*, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime." (Italics added.)

In light of the court's clarifying oral instructions and the foregoing written instruction that it gave under CALCRIM No. 3517, we conclude it was not reasonably likely the jury would have failed to understand that it could consider and discuss the lesser included offenses before it made its decisions on the corresponding charged offenses.

17

b. *Dewberry*

Relying on *People v. Dewberry* (1959) 51 Cal.2d 548 (*Dewberry*), Rafail also claims the court erroneously failed to instruct the jury that if it had a reasonable doubt whether a greater or a lesser offense was committed, it had to convict him of the lesser offense. In support of this claim, he asserts "[t]he absence of this clarification aggravated the already-contaminated instructions on the lesser-included offenses." This claim is unavailing.

*Dewberry* held that when the evidence is sufficient to support a finding of guilt of both a charged offense and a lesser included offense, the trial court must instruct the jurors that if they have a reasonable doubt which crime the defendant committed, they must give the defendant the benefit of the doubt and find him guilty of the lesser crime, provided they are convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime. (*Dewberry*, *supra*, 51 Cal.2d at pp. 555-556.) *Dewberry* explained that "[i]n every case the principle of reasonable doubt requires an acquittal of an offense when the prosecution has not met its burden of proof. Thus, [when] reasonable doubt exists . . . as between the inclusive and included offense, the jury can only convict of the crime whose elements have been proved beyond a reasonable doubt." (*Id.* at p. 556.)

Here, the court properly instructed the jurors under CALCRIM Nos. 220 and 3517 that if they had a reasonable doubt as to whether Rafail committed a charged offense or a corresponding lesser included offense, they must find him guilty of the lesser offense, provided they were convinced beyond a reasonable doubt that Rafail was guilty of the lesser crime. The court's instruction under CALCRIM No. 220 told the jury the

18

prosecution had to prove Rafail was guilty beyond a reasonable doubt, and he was entitled to an acquittal if the evidence did not prove him guilty beyond a reasonable doubt. The court's instruction under CALCRIM No. 3517 reflected and incorporated the principle of reasonable doubt set forth in CALCRIM No. 220—and its specific application under *Dewberry*—because it informed the jury it could not find Rafail guilty of a greater crime unless all the jurors agreed he was guilty of the greater crime beyond a reasonable doubt. Thus, the court's instructions under CALCRIM Nos. 220 and 3517 did not permit the jury to find Rafail guilty of the greater offense of sodomy or committing a lewd act upon a child in the event the jurors did not agree or some of them had a reasonable doubt about whether he was guilty of the greater offense.

   2. *Prosecutorial misconduct claim*

   Rafail also contends the prosecutor erroneously "instructed the jury NOT to consider the lesser included offenses." In support of this contention, Rafail relies on the following incomplete excerpt of the prosecutor's closing argument statements:

> "And what that means is *you don't get to the lesser included offenses* that were talked about. *So the lesser included offenses* of assault or battery as it relates [*sic*] to sodomy, *you don't get to those*. You leave those blank. And you move on to the next one. [¶] You fill out the next verdict form. You see the lesser included offense. You leave that blank. It's only if you can't agree or you find him not guilty that you then move on to the lesser charge." (Italics added.)

   Rafail asserts that the prosecutor's foregoing statements "magnified" the claimed ambiguity of the court's instructions because they told the jurors they "could *not* look at the lesser included crime until *after* they concluded that he was not guilty of the charged crime."

19

We reject Rafail's contention because he has quoted the prosecutor's foregoing statements out of context and he misconstrues her remarks. Rafail disregards the prosecutor's statements that immediately preceded the excerpt quoted above. The prosecutor actually told the jury:

> "You're going to fill in your answers. *If it's guilty, true and true, for example, you sign and date.* [¶] And what that means is you don't get to the lesser included offenses that were talked about. So the lesser included offenses of assault or battery as it relates [*sic*] to sodomy, you don't get to those. You leave those blank. And you move on to the next one. [¶] You fill out the next verdict form. You see the lesser included offense. You leave that blank. It's only if you can't agree or you find him not guilty that you then move on to the lesser charge." (Italics added.)

Rafail disregards the prosecutor's foregoing statement, "If it's guilty, true and true, for example, you sign and date." The full excerpt shows the prosecutor properly explained that *if* the jury reached a guilty verdict on a greater offense, it should not complete the verdict form for a corresponding lesser included offense. The prosecutor did *not* argue, as Rafail erroneously claims she did, that the law precluded the jury from *considering* a lesser included offense until *after* it had decided Rafail was not guilty of the charged greater offense. Although Rafail urges this court to interpret the prosecutor's statements "you don't get to the lesser included offenses" and "you don't get to those" as a "firm instruction" or a "flat-out misstatement of the law", neither those partial statements nor the context we have discussed support such an interpretation.

20

## II. COUNT 23 (*CLAIMS OF INSUFFICIENCY OF THE EVIDENCE AND INSTRUCTIONAL ERROR*)

Rafail also challenges his conviction of count 23, the lewd act charge (§ 288(c)(1)) that involved his videotaped shaving of Jeremy's pubic hair and testicles. Rafail does not contend the evidence of the elements of this offense was insufficient. Instead, he raises various contentions regarding (1) the extension of the applicable statute of limitations under section 803, subdivision (f) (hereafter section 803(f)), which extends the time period within which the People may charge specified sexual offenses committed against a child, subject to certain restrictions; and (2) the related jury instruction given by the court, CALCRIM No. 3250 ("Time Limitation for Prosecution ([§] 803(f))").

Specifically, Rafail contends there is insufficient evidence to support the jury's finding that the prosecution met its burden of proving the requirements under section 803(f) and CALCRIM No. 3250 for extending the statute of limitations period for count 23 because (1) there is no evidence of "substantial sexual conduct" by "mutual masturbation," and (2) there is no independent evidence corroborating Jeremy's testimony. Rafail also contends CALCRIM No. 3250 as given by the court confused the jury. These contentions are unavailing.

A. *Background*

1. *Defense motion for acquittal* (*count 23*)

After the People rested their case, Rafail brought a motion under section 1118.1 for judgment of acquittal as to count 23 for insufficient evidence. Defense counsel argued there was no evidence of substantial sexual conduct because there was no

evidence that Rafail or Jeremy became sexually aroused. The court denied the motion, finding there was sufficient circumstantial evidence that during the shaving incident, Rafail acted with a sexual purpose. The court stated, "[T]hat's why he wanted to have it videotaped and why he was willing to pay [Jeremy] $750 to do it." The court also found the People had presented sufficient evidence of substantial sexual conduct within the meaning of section 803(f), citing *People v. Lamb* (1999) 76 Cal.App.4th 664 (*Lamb*) for its definition of the term "mutual masturbation" used in CALCRIM No. 3250.

2. *Court's instruction under CALCRIM No. 3250*

Later, without a defense objection, the court instructed the jury with a modified version of CALCRIM No. 3250. That instruction informed the jury that if it found Rafail guilty of count 23, it was also required to decide whether the People had "proved the additional allegation that the crime was committed pursuant to Penal Code section 803(f)" (hereafter the section 803(f) allegation).[8] The instruction informed the jury that to prove this allegation, the People were required to prove that (1) the victim was under the age of 18 at the time of the charged crime, (2) the victim reported the crime to law enforcement and the criminal complaint in this case was filed within one year of that

---

[8] The section 803(f) allegation in count 23 of the amended information stated: "And it is further alleged that within one year of filing this criminal complaint . . . the above offense was reported to a California law enforcement agency by a person of any age alleging that [he,] while under the age of 18 years[,] was the victim of a crime described in Penal Code section 288, and that the limitation periods specified in Penal Code sections 800, 801 and 801.1 have expired, and that the offense involves *substantial sexual conduct* as defined by Penal Code section 1203.066(b), and there is *independent evidence that corroborates the victim's allegation*, within the meaning of PENAL CODE SECTION 803(f)." (Italics added.)

22

report, (3) the 10-year statute of limitations had expired, (4) the alleged crime (§ 288(c)(1)) involved "substantial sexual conduct," and (5) "clear and convincing evidence . . . corroborat[ed] the victim's allegation."

The instruction defined "clear and convincing" evidence as evidence that "persuade[s] you that it is highly probable that the fact is true." It defined "substantial sexual conduct" as "penetration of the vagina or rectum of either the child or the defendant by the penis of the other or by any foreign object, oral copulation of either the child or the defendant, or *mutual masturbation of either the child or the defendant*." (Italics added.) The instruction also defined "masturbation" as "any contact, however slight, of the genitals or sexual organ of either the child or the defendant."

The court's instruction also explained the People's burden of proving the section 803(f) allegation by a preponderance of the evidence:

> "The People have the burden of proving by a preponderance of the evidence that prosecution of this case began within the required time. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the People must prove that it is more likely than not that prosecution of this case began within the required time. If the People have not met this burden, you must find the defendant not guilty of these crimes."

3. *Prosecutor's closing argument*

In her closing argument, the prosecutor stated with respect to count 23, "You heard testimony that [Rafail] . . . shaved Jeremy's testicles and then performed oral sex on him later. That was at [Rafail's] parents' house in Escondido."

23

Regarding the section 803(f) allegation in count 23 concerning the statute of limitations, the prosecutor argued that the People had proved Jeremy was under the age of 18 years when Rafail committed count 23, that the criminal complaint was filed within a year after Jeremy reported the crime to law enforcement, and that the crime involved substantial sexual contact. The prosecutor told the jury that substantial sexual contact included oral copulation and masturbation. She also told the jury that "even slight touching of the genitals, under the law[,] is considered masturbation."

The prosecutor also told the jury, "You have to have clear and convincing evidence that corroborates Jeremy's testimony. The clear and convincing evidence in this case is the video. [¶] That corroborates Jeremy's testimony. And this statute of limitations needs to be proven by a preponderance of the evidence, more likely than not. So we know that the statute of limitations [has] been met."

B. *Applicable Legal Principles*

1. *Section 803(f)*

As already noted, section 803(f) extends the time period within which the People may charge specified sexual offenses committed against a child, subject to certain restrictions. Specifically, when a person of any age reports that he or she was a victim of various sexual offenses, including offenses under section 288, while under the age of 18, section 803(f) authorizes a criminal complaint to be filed within one year of that person's initial report to a law enforcement agency. (§ 803, subd. (f)(1).) This statutory extension of the limitation period applies only if the following three requirements set forth in section 803, (f)(2)(A) through (f)(2)(C) are met: (1) the applicable statute of limitations

24

period has expired (§ 803(f)(2)(A)), (2) the crime involved "substantial sexual conduct" as defined by section 1203.066, subdivision (b) (hereafter section 1203.066(b)), excluding "masturbation that is not mutual" (§ 803(f)(2)(B)); and (3) independent evidence "*clearly and convincingly* corroborate[s] the victim's allegation" (§ 803(f)(2)(C), italics added).

Thus, as pertinent here, section 803(f) expressly incorporates the definition of "substantial sexual conduct" contained in section 1203.066(b) with the exception of "masturbation that is not mutual."  (§ 803(f)(2)(B).)

Section 1203.066(b) defines "[s]ubstantial sexual conduct" as "penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or *masturbation of either the victim or the offender*" (§ 1203.066(b), italics added), excluding (as already noted) "masturbation that is not mutual" (§ 803(f)(2)(B)).  Although this exclusion−"masturbation that is not mutual"−is not statutorily defined, the courts have clarified that it "refers to a defendant's self-masturbation in the presence of the victim."  (*People v. Terry* (2005) 127 Cal.App.4th 750, 771 (*Terry*), citing *Lamb*, *supra*, 76 Cal.App.4th at pp. 677-682.)  Therefore, a defendant's "acts in masturbating the victim fall within the definition of mutual masturbation" (*Lamb*, at p. 682) and qualify for the extended statute of limitations described in section 803(f).  (§ 803(f)(2)(B); see *Terry*, at p. 771 [a defendant's "'acts in masturbating the victim fall within the definition of mutual masturbation set forth in section 803, subdivision (g), and thus qualify for the extended statute of limitations described in that section'"].)

25

"Masturbation encompasses any touching or contact, however slight, of the genitals of the victim or the offender done with the intent to arouse the sexual desires of the victim or the offender." (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1098, fn. 9 (*Dunn*); see *Terry*, *supra*, 127 Cal.App.4th at p. 772.)

"The People ha[ve] the burden to prove the charges were timely brought." (*People v. Ruiloba* (2005) 131 Cal.App.4th 674, 681 (*Ruiloba*).) Although the prosecution bears the burden of proving each element of an offense beyond a reasonable doubt, "the statute of limitations is not an ingredient of an offense but a substantive matter for which the prosecution's burden of proof is a *preponderance of the evidence*." (*People v. Riskin* (2006) 143 Cal.App.4th 234, 241, italics added; see *Ruiloba*, at p. 681 [People's burden in proving charges were timely brought under § 803, subd. (g) "is by a preponderance of the evidence"].)

2. *Standards of review*

a. *Insufficiency-of-the-evidence claims*

When assessing a challenge to the sufficiency of the evidence supporting a conviction, we apply the substantial evidence standard of review, under which we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence−that is, evidence which is reasonable, credible, and of solid value−such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

In this regard, substantial evidence is "evidence sufficient to 'deserve consideration by the jury,' not '. . . *any* evidence . . . presented, no matter how weak.'" (*People v. Williams* (1992) 4 Cal.4th 354, 361.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

b. *Instructional error claims*

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919.) "In reviewing a claim of instructional error, the ultimate question is whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.'" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220.) "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*Ibid.*) We review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

C. *Analysis*

1. *Sufficiency of the evidence*

a. *Substantial sexual conduct*

Rafail contends there is insufficient evidence to support the jury's finding that the prosecution met its burden of proving the requirements under section 803(f) and CALCRIM No. 3250 for extending the limitation period for count 23 because there is no

27

evidence of "substantial sexual conduct" by mutual masturbation. We reject this contention. Viewing the evidence in the light most favorable to the judgment of conviction, as we must (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578), we conclude the prosecution met its burden of presenting substantial circumstantial evidence from which a reasonable trier of fact could infer by a preponderance of the evidence (see *Ruiloba*, *supra*, 131 Cal.App.4th at p. 681) that when Rafail helped Jeremy shave his pubic hair and wash himself, his actions constituted "substantial sexual conduct" by means of mutual masturbation within the meaning of section 803(f)(2)(B). As already discussed, a defendant's "'acts in masturbating the victim fall within the definition of mutual masturbation'" (*Terry*, *supra*, 127 Cal.App.4th at p. 771), and masturbation "encompasses any touching or contact, however slight, of the genitals of the victim or the offender done with the intent to arouse the sexual desires of the victim or the offender." (*Dunn*, 205 Cal.App.4th at p. 1098, fn. 9.)

Here, the prosecution presented substantial circumstantial evidence supporting a reasonable inference that Rafail was sexually attracted to prepubescent boys, he received sexual gratification from the process of shaving Jeremy, and he wanted to help Jeremy shave himself so that he (Rafail) would experience more satisfaction from the sexual acts he committed later in the evening. Jeremy testified regarding the offense charged in count 23 that, when he was 15 years old, Rafail gave him a few beers and offered him $750 if he (Jeremy) would shave off his pubic hair. Rafail helped Jeremy shave himself and videotaped the act. Jeremy also testified that after Rafail helped shave his testicles, Rafail used his hands to help wash Jeremy's testicles and penis. After they had a couple

28

more drinks, Rafail asked him to wear a white cotton thong before they went to bed in the same bed.  Jeremy also testified that after he fell asleep, he awoke to find Rafail giving him oral sex.

Based on the foregoing substantial evidence, a reasonable trier of fact could infer that Rafail engaged in "substantial sexual conduct" by mutual masturbation by helping Jeremy shave his pubic hair and wash his genitals "with the intent to arouse the sexual desires of the victim or the offender."  (*Dunn*, *supra*, 205 Cal.App.4th at p. 1098.)

b. *Corroboration*

Asserting that the prosecution "presented no independent witnesses to the [c]ount 23 shaving event," Rafail also contends there is insufficient evidence to support the jury's finding that the prosecution met its burden of proving the requirements under section 803(f) and CALCRIM No. 3250 for extending the statute of limitations period for count 23 because the prosecutor "presented no evidence−let alone *corroborating* evidence−that any of the listed acts that comprise *substantial sexual conduct* occurred."

We reject this contention.  Although section 803(f) requires corroboration of the victim's allegation by clear and convincing evidence (see § 803(f)(2)C), it does not require corroboration of any specific offense.  (*Ruiloba*, *supra*, 131 Cal.App.4th at p. 683.)  Evidence that generally shows a defendant's propensity to commit sexual offenses against a child may corroborate all of the charged offenses, even if that evidence does not particularly corroborate any specific offense.  (*Ibid*.)

Viewing the evidence in the light most favorable to the judgment, as we must (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578), we conclude the prosecution met its

29

burden of presenting substantial evidence that "clearly and convincingly corroborate[d] [Jeremy's] allegation" (§ 803(f)(2)(C)). Doe corroborated Jeremy's count 23 accusation by testifying that he remembered Rafail asking Jeremy to "shave his pubic hair" in exchange for "hundreds of dollars." Doe also testified he witnessed Rafail perform oral sex on Jeremy, thereby corroborating Jeremy's own testimony that Rafail performed oral sex on him after Rafail helped to shave Jeremy's testicles and after Rafail touched and washed Jeremy's testicles and penis. Both Doe and Phillip testified that Rafail videotaped his sexual acts with them, thereby corroborating Jeremy's testimony that Rafail videotaped his act of shaving Jeremy's pubic hair. Based on the foregoing substantial evidence, we conclude Rafail's contention the prosecution presented no corroborating evidence is meritless.

2. *Instructional error claim*

Rafail next contends the court's modified version of CALCRIM No. 3250 (discussed, *ante*) confused the jury because (1) it "correctly required any masturbation to be *mutual* to satisfy the requirements of section 803(f)" but then defined masturbation as "any contact, however slight, of the genitals or sexual organ of either the child or the defendant", and (2) it "introduce[d] two new burdens" (proof by clear and convincing evidence and proof by a preponderance of the evidence) that "operate[d] in addition to the beyond-a-reasonable-doubt burden for the elements of [c]ount 23." This contention is unavailing.

Our Supreme Court has explained that, "'[g]enerally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or

incomplete unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 (*Guiuan*).)

Here, Rafail's claim that the modified version of CALCRIM No. 3250 given by the court was confusing to the jury is a complaint that the court should have provided clarifying instructions. He states, "No clarifying instructions were given to the jury as to how to apply the two standards in addition to the reasonable doubt standard." However, the record shows the defense did not request any clarifying or amplifying language during the jury instructions conference, and it did not object to the giving of that set of instructions. Thus, we conclude Rafail forfeited his claim of instructional error because he did not request that the court give clarifying instructions. (See *Guiuan*, *supra*, 18 Cal.4th at p. 570; *People v. Valdez* (2004) 32 Cal.4th 73, 113 ["Defendant did not request the clarifying language he now contends was crucial and may not now 'complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete.'"].)

Were it necessary to reach the merits of Rafail's contention, we would reject it. Rafail's assertion that there is "something of a struggle" between the requirement that any masturbation be "mutual"—which he concedes is correctly set forth on the first page of the challenged instructions[9]—and the definition of masturbation set forth at the end of

---

[9]    The court instructed that "[*s*]*ubstantial sexual conduct* means penetration of the vagina or rectum of either the child or the defendant by the penis of the other or by any foreign object, oral copulation of either the child or the defendant, or *mutual masturbation of either the child or the defendant*." (Second italics added.)

31

the court's instructions,[10] is based on his own faulty interpretation of "mutual masturbation."  In addition, although the court's instructions under CALCRIM No. 3250 did involve the standards of proof by a preponderance of the evidence and proof by clear and convincing evidence, the court correctly explained those standards.  "We presume that jurors are intelligent and capable of understanding and applying the court's instructions."  (*People v. Butler* (2009) 46 Cal.4th 847, 873.)  Rafail has failed to show a likelihood that the jury misunderstood or misapplied those instructions.

### III.  *ADDITIONAL CLAIMS OF PROSECUTORIAL MISCONDUCT*

Rafail next contends the prosecutor committed misconduct many times (discussed, *post*) during her closing argument, and thereby violated his federal constitutional rights to cross-examination and a fair trial, by misrepresenting facts, misstating the law, "exploit[ing] existing confusion in the complex of facts and legal directives," "fabricat[ing] facts," and telling the jury to "cheat" the applicable standards of proof.  We conclude Rafail forfeited some of his claims of prosecutorial misconduct by failing to object to the challenged statements, and his remaining claims are unavailing.

#### A.  *Applicable Legal Principles*

"When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.  Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under

---

10    The court instructed that "[*m*]*asturbation* is any contact, however slight, of the genitals or sexual organ of either the child or the defendant."

32

state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." (*People v. Panah* (2005) 35 Cal.4th 395, 462 (*Panah*).) "Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected." (*People v. Shazier* (2014) 60 Cal.4th 109, 127 (*Shazier*).)

"To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury." (*People v. Brown* (2003) 31 Cal.4th 518, 553 (*Brown*).) "If the defendant fails to object to the asserted misconduct and does not request an instruction or admonition to lessen any possible prejudice, then the asserted objection is thereby waived." (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 36.)

"There are two exceptions to this forfeiture:  (1) the objection and/or the request for an admonition would have been futile, or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct." (*Panah*, *supra*, 35 Cal.4th at p. 462.)  "A defendant claiming that one of these exceptions applies must find support for his or her claim in the record.  [Citation.]  The ritual incantation that an exception applies is not enough." (*Ibid*.)

Prosecutors "ha[ve] a wide-ranging right to discuss the case in closing argument." (*People v. Lewis* (1990) 50 Cal.3d 262, 283.)  Thus, a prosecutor has wide latitude to discuss and draw inferences from the evidence presented at trial, and the question of whether the inferences the prosecutor draws are reasonable is for the jury to decide. (*Shazier*, *supra*, 60 Cal.4th at p. 127.)

Accordingly, "prosecutorial commentary should not be given undue weight." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21, superseded by statute on other grounds as explained in *In re Steele* (2004) 32 Cal.4th 682, 691.) "Juries are warned in advance that counsel's remarks are *mere argument*, missteps can be challenged when they occur, and juries generally understand that counsel's assertions are the 'statements of advocates.' Thus, argument should 'not be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made.'" (*Gonzalez*, at p. 1224, fn. 21, quoting *Boyde v. California* (1990) 494 U.S. 370, italics added.)

To prevail on a claim of prosecutorial misconduct based on the prosecutor's remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. (*Shazier*, *supra*, 60 Cal.4th at p. 127.)

B. *Analysis*

Rafail first claims the prosecutor committed misconduct during her closing argument (1) by stating without supporting evidence that "instead of mentoring Patrick V., [Rafail] masturbated him" and Rafail and Patrick "rubbed their penises together," that Patrick suffered a "lasting emotional scar", and that the jurors could use this "propensity evidence" concerning Patrick if they wanted to; (2) by stating that Rafail "started out with Patrick" and then "with John Doe took it to that next level" and (3) by mischaracterizing Doe's testimony by stating that Rafail "talk[ed] about sexual things with John Doe" and told him about sex, masturbation, and his own sexual acts as a child.

34

The Attorney General asserts Rafail forfeited these claims of prosecutorial misconduct because he failed to object during the prosecutor's closing argument. We agree. The record shows the defense did not object when the prosecutor made the foregoing remarks during her closing argument. By failing to object, Rafail forfeited the claims he now raises on appeal. (See *Brown, supra,* 31 Cal.4th at p. 553; *People v. Nguyen*, *supra*, 40 Cal.App.4th at p. 36.) Rafail attempts to avoid application of the forfeiture rule by asserting the court had "always overruled" other defense objections during the prosecutor's closing argument "on the grounds that it was 'just argument'" and "the efforts became futile." Rafail's argument is unavailing. As already discussed, a defendant claiming the futility exception to the forfeiture rule applies "must find support for his or her claim in the record" and the "[t]he ritual incantation that an exception applies is not enough." (*Panah*, *supra*, 35 Cal.4th at p. 462.) Here, the record shows that, although the court did overrule some of the defense objections on the ground the prosecutor's challenged remarks were "argument," it overruled other objections on other grounds.

Rafail also claims the prosecutor committed misconduct during her closing argument by "falsely claim[ing]" she had presented all of the evidence she had promised during her *opening* statement that she would present, such as evidence that Rafail molested Patrick while Patrick was asleep in the car on a "dark street," and that Rafail engaged in "oral sex on Patrick, mutual masturbation, [and] masturbating Patrick while masturbating himself." This claim is unavailing because Patrick specifically testified that Rafail would pick him up from school and either take him to get something to eat or drive

35

around, and then he would park on a street near Patrick's parents' house. Patrick also testified they "would usually just sit there, and sometimes I would fall asleep," and Rafail "would kind of pick me up over to him and . . . rub on my penis and had me rub his . . . ." Patrick further testified that Rafail "would have oral sex with me there and rub his penis on my butt and things . . . of that nature."

Rafail also claims the prosecutor committed misconduct during her closing argument by making "misrepresentations of fact" by "present[ing]" the "picture" that Phillip was "homeless and alone when he moved to San Diego" when she told the jury, "What was the one thing Phillip was missing when he came to California? He was missing a dad. He was missing his dad. He didn't have friends out here. He didn't have a community. Heck, he didn't even have a home when he first got here." This claim is unavailing because Phillip did testify, "I had no family out here. I had nobody." He also testified his father was in Philadelphia, he did not have connections in San Diego, "karate was [his] life at that time," and Rafail "kind of took the place of [his] father." Thus, the prosecutor's statements were accurate.

All of the foregoing claims of prosecutorial misconduct, are unavailing because, as Rafail acknowledges, the court instructed the jury under CALCRIM No. 222 that "[n]othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." We presume the jury in this case understood and followed these instructions. (See *People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9.)

36

In sum, we conclude Rafail has failed to meet his burden of showing a reasonable likelihood the jury understood or applied the prosecutor's complained-of closing comments in an improper or erroneous manner. (See *Shazier*, *supra*, 60 Cal.4th at p. 127.) We reject his contention that he was denied his federal constitutional rights to cross-examination and a fair trial.

## IV. *PROPENSITY EVIDENCE (EVID. CODE, § 1108)*

Rafail next contends that "the prosecution's misuse of the prior uncharged acts, and current uncharged acts, under [Evidence Code] sections 1101 and 1108 exploited existing confusion in the complex of facts and law which sabotaged most, if not all, of the safeguards to a constitutionally fair trial." We reject this contention.

A. *Background*

1. *Propensity evidence (Evid. Code, § 1108)*

The People filed a motion in limine seeking to admit under Evidence Code section 1108 evidence of Rafail's 1992 convictions of three counts of committing a lewd act upon a child (§ 288(a)) against Patrick. Rafail opposed the motion, arguing the convictions were remote and admission of the evidence would create a substantial danger of undue prejudice.

Following a hearing on the motion, the court found Rafail's prior conduct involving Patrick were "very similar" to his conduct involving the alleged victims in the instant case because both cases involved young boys, "[i]n both cases [he] got to know the parents and took over a position of trust with regards to the custody of the children," and both cases involved "the same type of conduct of fondling and orally copulating."

37

The court also found that the prior acts were not too remote in time because they took place in 1989, that Rafail was sentenced in 1992, that he was released on parole in 1995, and that the alleged incidents at issue in the present case began in 1997 to 1998, within two to three years after he was released on parole. The court also found the evidence regarding the crimes committed against Patrick was no more inflammatory than the evidence of the charged offenses and its presentation would not consume an undue amount of time. On the issue of prejudice, the court explained to defense counsel that the evidence "would be damaging as to your client's case, but damaging is not [synonymous] with prejudice. Evidence that uniquely tends to evoke an emotional bias against the Defendant which has little effect on the issues would be considered prejudicial." Thus, the court ruled the evidence was admissible under Evidence Code section 1108 because the probative value would not be "substantially outweighed by undue prejudice."

During the trial, outside the presence of the jury, defense counsel objected to Justin's testimony about uncharged offenses Rafail allegedly committed against him in Florida. The court ruled the testimony was admissible under Evidence Code sections 352 and 1108 because "this was an incident that occurred between the complaining witness and [Rafail] . . . . So I do think it is relevant." The court indicated its intent to provide a limiting instruction. Almost immediately thereafter, the court explained to the jury, "[A]t this time the testimony about the Florida incident, or alleged incident, will be admitted. You may hear it. It is evidence in this case to which you may give it whatever weight, if any, you think is appropriate." The court also told the jury, "The Court will instruct you in the final instructions on how to consider such evidence if you find that it was proven.

38

Also, I will remind you that any events that occurred outside of San Diego County are not part of the charged offenses. It's only incidents which occurred in San Diego County that are part of the charged offenses."

2. *CALCRIM No. 1191* ("*Evidence of Uncharged Sex Offense*")

During the jury instructions conference, the court explained it had initially added language to the CALCRIM No. 1191 instruction specifying that the uncharged sex offenses involved Patrick. The court then stated, "Now we have evidence of the incident which occurred in Florida," and asked counsel, "Do we add Justin S. to this?" The court explained that "[t]he advantage of having the two names in there is that the jurors are specifically told this information can only be considered under these circumstances, and not all the other information from the other complaining witnesses about stuff that occurred that wasn't charged." Defense counsel responded, "My preference would be that this jury instruction be generic and that the names be removed." The prosecutor expressed her agreement.

The court then read the first and last paragraphs of the draft instruction, explaining that it was removing the language referencing Patrick. The court stated, "With those modifications, [CALCRIM No.] 1191 will be given in that generic sense." Defense counsel confirmed he had no objections to that instruction.

The court thereafter instructed the jury, both orally and in writing, with the modified version of CALCRIM No. 1191 discussed during the jury instructions conference. That instruction generically stated that "[t]he People presented evidence that

39

the Defendant committed the crimes of Lewd Act on a Child . . . that were not charged in this case."[11]

The court also instructed the jury with CALCRIM No. 303 ("Limited Purpose Evidence in General"), which stated: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

B. *Applicable Legal Principles*

1. *Evidence Code sections 1108 and 352*

As a general rule, evidence of a person's character, including evidence of a person's character in the form of specific instances of uncharged misconduct, is inadmissible to prove conduct on a specific occasion. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*), citing Evid. Code, § 1101, subd. (a) (hereafter Evid. Code,

---

[11] The modified version of CALCRIM No. 1191 the court gave to the jury stated in full: "The People presented evidence that the defendant committed the crimes of Lewd Act on a Child in violation of Penal Code section 288(a) that were not charged in this case. These crimes are defined for you in these instructions. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the sexual offenses as charged in this case. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charges in this case. The People must still prove each charge and allegation beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose."

§ 1101(a)).)  Thus, evidence of other crimes or bad acts is generally inadmissible when it is offered to show a defendant had the criminal disposition or propensity to commit a charged crime.  (*Ewoldt,* at p. 393.)

However, an exception to this rule is set forth in section 1108, which provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."  (Evid. Code, § 1108, subd. (a), hereafter Evid. Code, § 1108(a); *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1115-1116.)

In *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*), the California Supreme Court explained the legislative purpose of Evidence Code section 1108:

> "[T]he Legislature enacted [Evidence Code] section 1108 to expand the admissibility of disposition or propensity evidence in sex offense cases. . . .  [¶]  Available legislative history indicates [Evidence Code] section 1108 was intended in sex offense cases to relax the evidentiary restraints [Evidence Code] section 1101[(a)] imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility."  (*Falsetta*, at p. 911.)

Thus, Evidence Code section 1108 allows admission, in a criminal action in which the defendant is accused of one of a list of sexual offenses, of evidence of the defendant's commission of another listed sexual offense that otherwise would be made inadmissible by Evidence Code section 1101(a).  (See Evid. Code, § 1108, subds. (a), (d)(1).)

Furthermore, the uncharged and charged offenses are considered *sufficiently similar* if they are both sexual offenses enumerated in Evidence Code section 1108.

41

(*People v. Frazier* (2001) 89 Cal.App.4th 30, 41 (*Frazier*).) *Frazier* explained that "[t]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in [Evidence Code] section 1108." (*Frazier*, at pp. 40-41.)

In *Falsetta*, *supra*, 21 Cal.4th 903, the Supreme Court explained that, in determining whether to admit Evidence Code section 1108 propensity evidence of a defendant's prior sexual offense, trial courts "must engage in a careful weighing process under [Evidence Code] section 352" by "consider[ing] such factors . . . as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, at pp. 916-917.) The *Falsetta* court held that Evidence Code section 1108 does not violate due process principles, and, thus, is constitutionally valid, because it subjects evidence of uncharged sexual misconduct to the weighing process of Evidence Code section 352 in sex crime prosecutions. (*Falsetta*, *supra*, at pp. 907, 917-918, 922.)

Under Evidence Code section 352, evidence is properly excluded if its probative value is "substantially outweighed" by the probability that its admission will necessitate

42

undue consumption of time, or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.) A decision to exclude evidence under Evidence Code section 352 comes within the trial court's broad discretionary powers and "will not be overturned absent an abuse of that discretion." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638 (*Karis*).) "'In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.'" (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)

2. *Standard of review*

On appeal, we review the trial court's admission of Evidence Code section 1108 evidence, including its Evidence Code section 352 weighing process, for abuse of discretion. (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1104-1105; *People v.*

43

*Miramontes* (2010) 189 Cal.App.4th 1085, 1097.) "We will not find that a court abuses its discretion in admitting such other sexual acts evidence unless its ruling '"falls outside the bounds of reason."'" (*Dejourney*, at p. 1105.) Alternatively stated, we will not reverse a trial court's exercise of discretion under Evidence Code sections 1108 and 352 unless its decision was ""'arbitrary, capricious, or patently absurd [and] resulted in a manifest miscarriage of justice."'" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286; *People v. Nguyen*, *supra*, 184 Cal.App.4th at p. 1116.)

C. *Analysis*

Rafail contends the court abused its discretion and violated his constitutional right to a fair trial by admitting evidence that (1) he had been convicted of sexual offenses (§ 288(a)) he committed against Patrick in 1989, and (2) he had committed an uncharged sexual offense (oral copulation) against Justin in Florida. This contention is premised on Rafail's assertion—which is not supported by a citation to the record as required by rule 8.204(a)(1)(C) of the California Rules of Court[12]—that "the prosecution introduced the 1989 acts (prior [§] 288(a) conviction) under the theory of a 'common design or plan'" within the meaning of Evidence Code section 1101, subdivision (b).[13] He then cites

---

[12]    Rule 8.204(a)(1)(C) of the California Rules of Court states that each appellate brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." All further rule references are to the California Rules of Court.

[13]    Subdivision (b) of Evidence Code section 1101 provides that "[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent,

44

*Ewoldt*, *supra*, 7 Cal.4th 380, for the proposition that "a <u>greater degree</u> of similarity is required to prove existence of a *common design*."[14]  Rafail then asserts−again without a citation to the record as required by rule 8.204(a)(1)(C)−that the prosecutor "argued a *nonexistent* similarity between the prior acts and the facts supporting the present charges" and she "simply fabricated the similarity."

Rafail has distorted the record.  Contrary to his assertion that the prosecution presented the evidence of Rafail's prior sexual offenses against Patrick under the theory of a "common design or plan" within the meaning of Evidence Code section 1101, subdivision (b), the record (discussed, *ante*) shows the prosecutor presented this evidence as *propensity* evidence as authorized under Evidence Code section *1108*.  Rafail's reliance on *Ewoldt* and subdivision (b) of Evidence Code section 1101 is misplaced because they have no application here.  Our decision is governed by Evidence Code section 1108.

Rafail has failed to meet his burden of showing the court abused its discretion by admitting propensity evidence of his prior sexual offenses against Patrick and his uncharged acts against Justin in Florida.  Regarding the similarity requirement for

preparation, *plan*, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act."

14     For evidence of uncharged misconduct to be admissible under subdivision (b) of Evidence Code section 1101 to prove such facts as motive, intent, identity, or *common design or plan*, the charged offenses and uncharged misconduct must be "sufficiently similar to support a rational inference" of these material facts.  (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)  "The least degree of similarity . . . is required in order to prove intent." (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.)  "A greater degree of similarity is required in order to prove the existence of a *common design or plan*." (*Ibid*., italics added.)

admission of propensity evidence in sex offense cases, as already discussed, "[t]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in [Evidence Code] section 1108." (*Frazier*, *supra*, 89 Cal.App.4th at pp. 40-41.)

Here, Rafail acknowledges his prior sex offenses against Patrick were convictions for lewd or lascivious acts upon a child under the age of 14 years in violation of section 288(a)−one of the enumerated sexual offenses listed in subdivision (d)(1)(A) of Evidence Code section 1108. The propensity evidence of Rafail's uncharged acts against Justin in Florida when Justin was 15 years old also involved lewd acts. All 25 of the charged sex offenses in this case−violations of sections 288(a), 288(c)(1), and 286(i)−are also listed in subdivision (d)(1)(A) of Evidence Code section 1108. The uncharged and charged offenses are sufficiently similar for purposes of Evidence Code section 1108 because they are both sexual offenses enumerated in subdivision (d)(1)(A) of that section. (See *Frazier*, *supra*, 89 Cal.App.4th at pp. 40-41.)

Thus, the challenged propensity evidence at issue here was admissible under Evidence Code section 1108 to prove Rafail had a propensity to commit the charged and listed offenses of which he ultimately was convicted in this case, unless that evidence was inadmissible under Evidence Code section 352. (See Evid. Code, § 1108(a).)

"'[T]he willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of a witness.'" (*Falsetta, supra*, 21 Cal.4th at p. 912.)

Here, the evidence of Rafail's uncharged sexual offenses against Patrick and Justin was highly probative because those offenses involved conduct similar to the acts he allegedly committed against Doe, Phillip, and Jeremy. The evidence summarized, *ante*, in the factual background shows all the victims of both the charged and uncharged offenses were boys who were 15 years old or younger when Rafail committed those offenses, and they all alleged he performed oral sex upon them. All of the victims described a man who ingratiated himself with the boys and their parents by assuming a role as a tutor or coach. The evidence shows that whether Rafail's role was that of an afterschool tutor, a paintball coach, or a karate coach, he obtained the trust of the boys and their parents and exploited that trust in order to isolate the boys and sexually molest them. Rafail's claim that the prosecutor "simply fabricated [a] similarity" where none existed, is not supported by the record. To the contrary, the uncharged offenses were very similar and relevant to the charged offenses.

The propensity evidence was not unduly prejudicial. As already discussed, "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*Karis*, *supra*, 46 Cal.3d at p. 638.) Here, the uncharged sexual conduct about which Patrick and Justin testified did not involve rape, violence, or threats; and they testified about relatively few sexual acts. In contrast, Doe testified that

47

Rafail videotaped his sexual acts with Doe, asked Doe to provide oral sex, purchased numerous gifts for Doe, "dryhumped" him, and sexually molested him on many more occasions. Phillip also testified that Rafail purchased numerous gifts for him, recorded videos of sexual acts without his knowledge, gave him medication to relax him, and sodomized him. Thus, the evidence of Rafail's uncharged sexual molestations of Patrick and Justin was less inflammatory than the evidence presented to prove the charged offenses. Although the Evidence Code section 1108 propensity evidence showing Rafail had sexually molested Patrick and Justin was harmful to his defense in that it tended to prove his guilt of the charged sexual offenses, we cannot conclude it "'uniquely tend[ed] to evoke an emotional bias against the defendant as an individual [with] very little effect on the issues.'" (*Karis*, at p. 638.)

Rafail also complains that the court promised it would give a limiting instruction to the jury but failed to do so. His complaint is unavailing. Although the evidence of Rafail's uncharged sexual offenses was admitted to prove the charged offenses, the court explained to the jury that such evidence was *insufficient by itself* to find Rafail guilty of the charged offenses. Specifically, the court cautioned the jury that it could find Rafail guilty of the charged offenses only if it found that "the evidence proves the defendant guilty beyond a reasonable doubt," and it instructed the jury under CALCRIM No. 1191 that the uncharged conduct evidence was "only one factor to consider, along with all the other evidence" and "[i]t [was] not sufficient by itself to prove that [Rafail was] guilty of the charges in this case." The prosecutor reinforced these instructions during her closing arguments. Although the prosecutor discussed the uncharged acts, she stressed to the

48

jury that those acts were not charged in this case, she explained that this case was about Rafail's molestation of Doe, Phillip, Justin, and Jeremy S.; and she reminded the jury that the People carried the burden of proving the charged offenses beyond a reasonable doubt.

Rafail also contends the prosecutor encouraged the jury to convict him of the charged offenses based upon propensity evidence alone. We reject this contention. A review of the reporter's transcript of the prosecutor's closing arguments shows she made no such statement and she did not rely upon the uncharged sexual acts while arguing how she had proved Rafail committed the charged offenses. Although Rafail quotes extensively from the prosecutor's closing argument, he provides no analysis of those arguments. The record shows the prosecutor clearly indicated that the uncharged sexual acts were not charged in this case, and she clarified that the jury could disregard the evidence of those uncharged acts if it chose to do so. In addition, she emphasized that Rafail was presumed to be innocent and it was the People's burden to prove all elements of the charged offenses beyond a reasonable doubt.

Rafail also asserts the prosecutor "left [a] significant section out" of her discussion of CALCRIM No. 1191, and thereby "[left] the jury with a somewhat muddled understanding of how the various charges and burdens of proof played into one another." However, during the prosecutor's closing argument, the court clarified that "the Court has told the jury if anything that the attorneys say is contrary to . . . the Court's indication of the law, the jury is to follow the Court"s instructions." The court also instructed the jury under CALCRIM No. 200, "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

49

For all of the foregoing reasons, we conclude that the court properly admitted the propensity evidence under Evidence Code sections 1108 and 352 and that Rafail has failed to show his constitutional rights to due process and a fair trial were violated.

## V. *COURT'S RESPONSE TO JURY QUESTION*

Last, Rafail contends the court "committed reversible error when it failed to adequately address the jury's request for assistance in jury note [No.] 1." This contention is unavailing.

### A. *Background*

During deliberations, the jury sent to the court a note (jury note No. 1) that stated:

> "We have a 2-part request relating to testimony about John Doe showering with the defendant: [¶] 1) *Query* testimony from John Doe about showering with the defendant[;] [¶] 2) *Query* testimony from Justin S. about boys (specifically John Doe) showering with the defendant." (Italics added.)

The court and both counsel had difficulty reading the word that followed "1)" and "2)," but agreed the word was "query."

The court drafted a response that stated:

> "The Court is having some difficulty reading the note submitted. It appears that you are asking for read back of certain portions of testimony from John Doe and Justin S. As to John Doe['s] and Justin S.'[s] testimony, if you wish to have any part of their testimony read back, you will be required to listen to read back of their entire testimony. The Court Reporter cannot select which portions to read to the jury. [¶] Are you requesting read back of John Doe's and Justin S.'[s] testimony?"

The court discussed its draft response with counsel. The prosecutor agreed with the proposed response. Defense counsel initially stated, "I would request that they just be

50

given a read back like we would do in trial, where if we have a witness on the stand, I can ask . . . the Court to ask the court reporter to do a read back of the last question or the witness['s] answer to the last question."  In response, the court stated, "[W]hat I'm not going to do is have Madam Court Reporter go back there and try and figure out which portions she should read and which ones she shouldn't.  [¶] So if they want a portion of the testimony from one of those witnesses, then they're going to be told they have to listen to the entire testimony of that witness."  Defense counsel replied, "That's fair."

Following a brief discussion off the record, the court confirmed that both counsel agreed with the court's proposed response, and then it stated:  "All right.  We will send that back and see if they are actually requesting read back."

The court sent to the jury its response to jury note No. 1 and then recessed the court proceedings until the following day.  The next day, early in the afternoon, the jury returned its verdicts without requesting a read-back of testimony.

B.  *Section 1138*

Section 1138 provides:  "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, . . . they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

Thus, section 1138 "'provides that only when there is a disagreement among the jurors as to the testimony must it be read to them.'"  (*People v. Stafford* (1973) 29 Cal.App.3d 940, 944 (*Stafford*), italics omitted.)

51

C. *Analysis*

As noted, Rafail claims the judgment must be reversed because the court "failed to adequately address the jury's request for assistance in jury note [No.] 1." However, he does not explain in what respect the court's response was inadequate.

To the extent Rafail suggests the court violated section 1138 by failing to order the court reporter to read back Doe's and Justin's testimony to the jury, any such claim is unavailing because section 1138 requires a read-back of testimony "only when there is a *disagreement* among the jurors as to the testimony." (*Stafford*, *supra*, 29 Cal.App.4th at p. 944, italics added.) Here, as was the case in *Stafford*, "it does not appear that there was such disagreement but only that the jury wanted certain testimony to be reread." (*Ibid*.)

Rafail asserts "[t]here is nothing in the record that indicates that the jury agreed that 'query' was the intended word." However, in its response to jury note No. 1, the count notified the jury that the court was "having some difficulty reading the note submitted," and it specifically asked the jury, "Are you requesting read back of John Doe's and Justin S.'[s] testimony?"

Rafail asserts it is "important" that "there is nothing in the record that indicates the jury's answer to the Court's question, or whether any of the testimony was read back to the jury at all." However, the fact that the record shows the jury did not respond to the court's question indicates they decided to resume deliberations and they did not want or need a rereading of the testimony. (See *Stafford*, *supra*, 29 Cal.App.3d at p. 944 ["[T]he jury resumed its deliberations and apparently concluded that they could agree upon a verdict without having such testimony read."].)

In any event, Rafail forfeited his claim of error by consenting to the court's response to jury note No. 1.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 ["Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived."].)  For all of the foregoing reasons, we conclude Rafail's claim of error is unavailing.

## DISPOSITION

The judgment is affirmed.


                                                              NARES, Acting P. J.

WE CONCUR:


McINTYRE, J.


IRION, J.